and Calabrese versus Uber Technologies. If you wish to ask a question, please raise your hand. Please... Shall I begin? You may proceed. Thank you. May it please the court. My name is Justin Swibler. I represent Judge Winder Singh in this action against Uber. We're here today... Are you going to reserve any of your time? How are you going to handle rebuttal? Thank you so much. We were splitting, obviously, with also our colleagues who are here on the Capriolis, and I can see the clock's correct. We've asked for seven minutes here. We asked for one minute in rebuttal. My colleagues are also requesting... I don't know how they're splitting their rebuttal, but they're also requesting seven minutes of the 15th. All right. Thank you. Go ahead, Mr. Swibler. Thank you. So prior to the first mandate, when we were here to the court, the court has described the first thing the district court was to do was to determine the exemption, specifically the Section 1 exemption under the FAA, so that is clearly where I'm going to start. The court erred in determining that Mr. Singh, who is a driver for Uber, does not belong to a class of transportation workers exempt under Section 1, the residual exemption of the FAA. She erred by first applying a narrow construction doctrine, which is no longer applicable law under more recent Supreme Court cases, but most importantly, reading words into the statute that are not present. Well, she followed the Wallace standard, right? Well, Wallace followed Cianstra. It specifically follows Cianstra, and Wallace does use the term... First of all, it is important to point out, Wallace came out before Morgan v. Sundance and came out before Saxon. Is it accurate to say that the majority of courts who've looked at this have, in fact, followed Wallace and asked that central purpose question? Well, I think central is about the same as primary, and so it's a little difficult to know. I mean, in Caprioli, they seem to be saying primary. Primary is not the correct standard. It is not in the statute, and that would be the Ninth Circuit's decision. The Grubhub decision, Wallace uses the word central, but the example that Judge Barrett gives is a dry cleaner. She says if a dry cleaner is cleaning clothes and then delivers those clothes to a customer who happens to be out of state, that's not the central part of their job. Similar to if I drive as a lawyer, if I do work in Jersey, driving here today does not make me coming across the state border central to my job as a lawyer. But Uber drivers are not the same. They belong to a class of workers who provide transportation to individuals, a large quantity of which is interstate, a very, very large quantity. When you say a very, very large quantity, it's also a very, very small percentage, right? I mean, I haven't seen anything to indicate that you've got information to show that your colleagues on the other side are wrong or that the district court was wrong in noting that it's like two, maybe two and a half percent at most that involve going across state lines at all. These are fundamentally and by an enormously large margin local trips. Isn't that the fact? Well, Your Honor, the trips are twice as long, so two and a half percent becomes five percent of their time. But most importantly, as the district judge found, I mean, I do want to say, yeah, we don't dispute that it's two and a half percent of the trips. Let me directly answer that if I didn't. That is not dispositive, though, whether it's a central part of their job duty. For example, the Southern District of New York pointed out aptly that, you know, a judge clerk's duty, they clearly engage in trial work, but trial work is not most of their time. As a lawyer, I clearly have engaged in this case, but this is not what I spend the predominant amount of my time doing. So two and a half percent being central, the fact that it's two and a half percent of trips, it's also 16 to 40 percent of all the drivers who have to do this work. But this is what the judge, and this is in the joint appendix 21, this is in the judge's opinion. Uber system, excuse me, drivers may complete rides to any place a car can go. They design, Uber designs its services to facilitate interstate travel. Its fare schedule contemplates interstate travel, and that is based in part on time and distance. Its deactivation policy penalizes drivers for declining interstate pickups in multistate territories, and it markets its business as, quote, transportation as reliable as running water everywhere for everyone. Those are the undisputed facts found by the district court. Those facts are not in any of the other cases. Because this court previously heard our case and sent us back down for discovery, we did get a lot more discovery. Uber has always framed the issue as two and a half percent, but we understand the context of that two and a half percent. We understand how they marketed their business. We understand what the driver's experience was. Two and a half percent, because of the amount of trips Uber drivers do every week, they're doing more trips per week than, in other words, Jersey drivers, for example, are constantly crossing state lines. We know for a fact that Uber, as a class, more than once every second is crossing the state border. To say that their system or their drivers are not interstate would be akin to saying the U.S. highway system is not interstate, because most individuals who get on the U.S. highway system are not actually taking interstate trips. Uber is providing central – oh, I'm sorry. But engaged in has to do some work. You're hoping that we read engaged in to mean minimally engaged in. Is there any case that would help you by saying engage can mean just a little bit you're engaged in? Absolutely. I mean, Kienstra, which Grubhub relies on, uses the word rarely, saying drivers who rarely cross state lines are still in this group. But more importantly, because I think we've got to go with the Supreme Court, Southwest v. Saxon, where Judge Thomas says being engaged just means being involved in. In fact, when we look at the way they described it, and this is in Saxon now, so this is the most recent Supreme Court case we have, quote, any class of worker directly involved in transporting goods across state or international borders falls within the Section 1 exemption. That's at page 1789. He then goes on further to say that transportation workers must be actively engaged in transportation of those goods across borders via the channels of foreign or state. So we have actively being engaged and directly involved. And here we clearly have both. Okay. We're pretty sure in time you've split your time, so let me ask you this. Burden of proof. You seem to be – I think you argued that the burden of proof is on Uber? Yes. How do you figure? When you're trying to get yourself under an exemption, isn't it usually on the person who's claiming the exemption to bear the burden of proof? Well, one, absolutely. But an exemption is different than an exclusion. Even though we call it an exemption, perhaps more artfully we should be calling it an exclusion. The statute completely excludes. And so if you read Section 1, we call it an exemption. Actually, Section 1 together says essentially that the act applies to all these individuals. But it creates a group it does not apply to when it's explaining who it applies to. So it's on Uber to prove the act applies to the people they want to solve it on. And, in fact, when this court first had the case in Singh, it said that the court must be convinced, must be convinced. I think there's something in what we said. Well, I think Singh – Don't the cases generally say that it's on the party seeking to apply? You can call it an exemption. You can call it an exclusion. You can call it whatever you want. But don't the cases say it's on the person seeking the protection of that to prove that they are entitled to it? Well, I would answer it this way. Most of the cases originally, like when they cite back the green tree, that's in with inconsonability. And we would understand that if we're trying to bring up a defense to the contract that it's unconsonable. That's going to be our burden. So to answer your question, I think they misapply that case. They're looking at green tree. But they do apply it that way. So my final question to you is, if you bear the burden of proof – I mean, are you fighting the burden of proof here because if you bear it, you don't think – Oh, absolutely not. I mean, we point this out. We only talk about it, I think, for about a page in our brief. We think it's important because we understand that this court's rulings today are likely to affect more than Mr. Singh. The evidence in this case is very concrete. There's a lot of evidence. But there is no reason to think that whichever way the court decides it, there will be evidence to support it. This is not a lack of evidence case. So I do want to point out, we do not think burden affects this case. But it's likely the court, in its standard of review, is going to discuss it. And we believe it is important it gets it right. But it does not affect the outcome in this case. We've never claimed otherwise. And you'll see it's not much of our brief. I know I'm out of time. I do just want to, if I can, just very quickly touch upon our non-FAA arguments. I think they are very important here. And they are equally dispositive of Uber's right to compel Mr. Singh to arbitration. May I continue? Well, you know what? You choose how you're going to split your time. But if my colleagues don't mind, I'll give you a couple minutes. Go ahead and make your point. Thank you so much. I will be very, very quick on this point. Uber has presented no admissible evidence whatsoever that Mr. Singh ever saw of what they call a terms and conditions document. You waived that argument. You never raised it on the first appeal. Well, Your Honor, with respect, Uber's never raised it either. And we were on a Rule 12 motion. The evidence that Uber has relied on, both to this court in its brief and to the district court, was not on a prior decision of this court but on evidence of a declaration that was signed in 2021, which is years after our first appeal. So us attacking evidence that wasn't even in existence in our first appeal would not follow the doctrine of waiver. The evidence didn't exist. The evidence that Uber relies on to establish this point did not exist in our first appeal. The first time we were here, Uber – He admitted he clicked to the link. No, Your Honor. What he admitted was when he first got an iPhone, which was back in August of 14, which was the document we were here about in the first appeal, but now we're here about a November 14 document. He said that when he first was given an iPhone from Uber in August of 14, there was some screen that he didn't click. That doesn't establish a terms and conditions document. It might be consistent, but it doesn't establish it. And it wouldn't have taken much if Uber had it to show a document or to explain why they don't have it was under the best evidence rule. They could have done either, but they haven't. Instead, they rely on a declaration. The declaration describes documents, even using capital letters, which is not admissible under any rule of evidence, which we challenged and which the court did not even rule on on those – did not even rule on our evidentiary challenges. In the district court, Uber did not argue waiver. So they are the ones, if anyone, who has now waived waiver. You can waive waiver as you can any doctrine. We were here on a summary judgment motion. All right. Got you. All right. We'll go ahead and we'll hear from your colleague, Mr. Nesbitt. Thank you, Your Honors. Good morning, Your Honor. May it please the Court. Roosevelt Nesmith for the plaintiff's James Calabrese. I'd like to reserve two minutes for rebuttal. Thank you, Your Honor. The primary issue before the Court is with regard to application of the Federal Arbitration Act and the scope of Section 1. I believe the factual record developed in the Court below as a result of the discovery ordered in the first Singh decision has demonstrated that, in fact, the drivers are sufficiently engaged in interstate commerce to come within the scope of the Section 1 exemption. And that's demonstrated not simply by the 2% factor that the Court earlier referred to has been a foundational finding for the Ninth Circuit and the First Circuit decisions in Capriole and in Cunningham. However, those courts did not have the information before them that 17% of Uber drivers have engaged in at least one interstate trip. And then when you look at the drivers who do most of the work on the app who remain for six months or longer, those drivers who have the greatest number of hours, who have the greatest economic impact, those drivers have 35% of those drivers have at least one interstate trip. Okay. Since our time is limited, let me ask you about your specific piece which is different from Mr. Singh's piece, and that is the opt-out clients you've got. And one of the arguments that you're making here is, as I understand it, that their opt-out provision is illusory and therefore shouldn't be given any credence. Maybe I'm not articulating that very well, but my question is are you saying that there's no contractual provision that could be written that would take off the table the arbitration issue once it had been agreed to? If you understand what I'm asking. I understand their argument to be, look, we were clear with people. We said if you at one point agreed to arbitration, that's it. We're not revisiting that anymore. We're taking that off the table. We're going to have later agreements with you. You'll be clicking on our stuff for the rest of your life if you're doing Uber with us. But once you're in on the arbitration, that's the Hotel California. You can check in any time you like. You can never leave. That's the way it works. If I've understood their argument correctly, your pushback on that is that that just can't be. There could never be a contract like that? No, Your Honor. It's not that there could never be a contract like that. I believe Your Honor stated clearly in that description. And that's what's missing here is that it's not clear to a reasonable reader, to a driver, that in fact if they opted out in a prior agreement, either one, that they cannot opt out in the superseding agreement, that if they didn't opt out the first time, they're still being presented in the first instance with the you may opt out of this agreement in the second instance. Then later, not clearly at all, is it presented in a separate paragraph and in not clear language that, well, if you are bound by a prior agreement, not saying clearly that if you didn't opt out in a prior agreement, just saying if you are bound, then you, in fact, can disregard that prior paragraph where it says you can opt out and, in fact, you cannot opt out. So it is in there, but it's not clear and it's not nearly clearly stated as it is the offer to opt out. So those two provisions are ambiguous and ultimately in conflict. So that's one aspect of it. Then there's also another reversal that they do, and they take the opposite position. If, in fact, you have opted out the first time, then they say, well, they don't make it clear in this second that, well, if that one, if you're going to carry through from the first agreement the failure to opt out, then it would make sense that if you opted out in agreement one, that you carry through your choice of opting out. But no, they say, well, in that instance, you have to reinforce your opting out in every subsequent agreement. Although I state it far more clearly today than they do in the agreement. So your point isn't that this is somehow contrary to public policy or they could never do it. Your argument is they just didn't do it. They were ambiguous, and the ambiguity has to be construed against them. Is that right? Correct, Your Honor. It's inherently ambiguous and, in fact, acts as a trap for any driver who actually in good faith intends to opt out and in reading the agreement could reasonably believe, one, that they have the opportunity to it. But if they have before, that there would be no need to opt out again because they've already expressed their intent to opt out of their employment agreement with Uber. So once that intent is expressed, it should carry forward. And, in fact, we would say even if it's been elected not in the first instance, they should be able to take advantage of the offer to opt out in the second instance. And the courts have gone both ways on this. The limited amount of decisions that have been made. Your Honor, if I could just follow up. The Wallace, you asked about Wallace. I think we both share that. I would say, in fact, the First and Ninth Circuit do not follow Wallace. They follow both. In Capriol, they follow Yellow Cab. They don't introduce any analysis as to the crossing state borders issue. Cunningham identifies that. But the Cunningham methodology of narrowing transportation workers to just those who level engagement similar to railway workers or to seamen has been foreclosed by Saxon. The adjustment generis does not work there.  Thank you, Your Honor. Appreciate your time. We'll have you back on rebuttal, and we'll hear from counsel for Uber. May it please the Court. Fianna Evangelos on behalf of the Uber defendants. Three years ago, this Court ordered the District Court to permit discovery on whether plaintiffs belong to the class of transportation workers engaged in interstate commerce. After that discovery, the District Court, in a thoroughly reasoned 36-page order, joined every federal circuit court, including the First and the Ninth, in holding that they do not, and nearly every federal district court as well. They have all held that Section 1 does not apply. And we would ask that this Court join that growing chorus and affirm. Can you tell us which state's contract law we should be applying here? And is it different for different plaintiffs? And does it matter? Well, Your Honor, it does not matter because, first of all, the Section 1 exemption does not apply. So we don't get to state arbitration law, which was the alternative basis for moving to compel arbitration here. But, second, even if we do get that far, we think that as to Mr. Singh, New Jersey law applies. And the District Court went through that analysis as to New Jersey law. And as to the Calabrese plaintiffs, they did not offer any other argument as to any other state law except for California, which the District Court correctly held would not apply. But all of the states where the Calabrese plaintiffs entered into their agreements, where they reside, all of those states, the result would be the same as New Jersey. And we've put in all of that in our briefing. Right, but you say we never get to that. We don't. And we don't get to that because of Wallace. Is that why? Well, Your Honor, we don't get to that because Section 1 does not apply as the Wallace decision makes clear. As the First Circuit, the Ninth Circuit, with respect to rideshare drivers, make clear. The Eleventh Circuit's decision in Hamrick, they all reach the same conclusion. Do you agree with Mr. Nesmith that Wallace hasn't been followed by these other circuits? That the First Circuit is following Yellow Cab? Wallace, interesting, but it's not the be all and end all. You've got different courts doing different things. Or is Wallace and now Justice Barrett's decision there about centrality really something that should be central to our thinking? It's the same standard, Your Honor, in every decision, whether courts use those same words or not. So I'll point to the Capriol decision there. What the Ninth Circuit said is that the interstate movement over long distances of goods and passengers, over national and state lines, was not an indelible part of the job of rideshare drivers as it is for railroad workers and seamen. So an indelible part of the job, the central part, these are all, and I do believe that it's all the same way of articulating the same principle. That's a factual assertion, right? Yes, Your Honor, and here we have a record. The record shows, the undisputed facts show it's consistent with the records that were in Capriol and Cunningham. Well, they say it's not, so why don't you answer them? Because they say, now we know a lot more, and we know that for the drivers who are actually the Uber drivers for most of the time, the ones who are using the app consistently and stay with the app the longest, they're doing interstate trips, you know, what did I think I heard, 35% of them have engaged in interstate travel? It's not 2% anymore, for the meaningful proportion that is the folks who do the most of this, it's a third of them are doing these trips, I guess, somewhat regularly. Well, two points, Your Honor. First, that's not the class of workers. The class of workers is all drivers who use the Uber app. It's not those who've made 50 or more trips in the last year, so that's number one. Second, even for that subset, even if that were the relevant class of workers, which it's not, the percentage is still 2%. So the percentage of drivers who once crossed the state line goes up a bit, because, of course, as drivers make more trips over time, chances are they might cross the state line. But the entire class of rideshare drivers here is, I think, 88% of them had never crossed the state line in 2020, and the 2% fact, which was critical in Capriol, as well as Cunningham, is the same even for the subset of drivers who plaintiffs are trying to rely on. But, of course, we look at the national rideshare drivers as a whole, that is the class of workers at issue here. And the record in Capriol and Cunningham reflected also the same thing as here, that these trips are on average six miles. We're talking about short distances, local trips. It's primarily intrastate. And I would like to address the point about Saxon that my opponent made. First, there was no dispute there that there was interstate transportation at issue. The only question was how far removed from it the workers were. And I think the Massachusetts Supreme Judicial Court's decision in Archer versus Grubhub explains how that is a totally different question. Why is it a different question? It's a different question because there the cargo workers were actually moving cargo in the midst of an interstate trip, and there was undisputed interstate transportation happening, but the issue was... How does that work when you're talking about all these airport trips? Why, if you're moving a person who's going to be traveling interstate, that it's not part of that, but if it's a crash test dummy and an inanimate object, suddenly it is part of interstate commerce. Well, thank you for bringing that up, Your Honor, because that is the second part of plaintiff's argument. And as the Ninth Circuit and the First Circuit both said, the fact that rideshare drivers pick passengers up at airports as part of their local transportation does not bring them within Section 1, and that's because of the Yellow Cab case. I know that's what they say, but I'm trying to get you to engage with the assertion you've just made, that the goods are traveling interstate and you've got workers who are just moving at intrastate, but they're moving that thing in interstate commerce. Why doesn't that same logic apply when the thing you're moving is a human being? Because, Your Honor, in the airline case, it was the airline coordinating the interstate trip across borders. The same as in the Amazon cases, WIFACA and Rittman, where it was alleged in those cases that Amazon was responsible for a coordinated national trip. The same as in the Yellow Cab case, where it was alleged that the railroad coordinated the local portion of the interstate travel. So there, where there were two kinds of cab rides, there were the rides that were coordinated by the railroad as part of that fare, the broader interstate fare, whereas the local trips that were just by happenstance, a passenger took a cab, as opposed to getting picked up or taking a bus or something else from the airport, that wasn't coordinated as part of the interstate travel. And every court, every appellate court, has agreed with that analysis. And also, then-Judge Jackson's decision in the Auspatics v. Lyft case also agrees with this. So the courts are really in agreement here that whatever way you look at it, this is not engagement in interstate commerce in the same way as railroad workers, seamen, and those that Congress had in mind when enacting the FAA. Would you mind shifting to the question that I was asking Mr. Nesmith about Calabresi opt-out plaintiffs? Your, make your pitch for why your document is clear when they make the argument somewhat forcefully that this is just a trap for these unwary drivers and that ambiguity certainly should go against you as the drafter of what is in effect a contract of adhesion. Well, Your Honor, it's not ambiguous as the Ninth Circuit held in Capriol. The same argument was made there. The agreement here at issue says that if you agreed to arbitration previously, then you will be opting out of the new agreement, but you'll still be bound by the earlier agreement that you agreed to. And that the existing arbitration agreement will remain in full force and effect, and that's at Joint Appendix 450. It says if you, and I'll quote, if you opt out of this arbitration provision and at the time of your receipt of this agreement, you were bound by an existing agreement to arbitrate disputes arising out of or related to your use of the Uber services and driver app, that existing arbitration agreement will remain in full force and effect. That seems very clear to me. The Ninth Circuit found that it was clear, so there is no ambiguity there. And so, of course, every single one of these plaintiffs accepted the 2015 agreement. Why is this under a section called opt out? It looks like what you're saying is, I mean, you're presenting something that sounds like you can opt out, but then you're saying you can't opt out. Is the way you've structured it creating ambiguity? No, Your Honor. It's not ambiguous at all, and I don't think plaintiffs can point to a single court that has found that this provision is ambiguous. The Northern District of California in the Nicholas v. Uber case reached the same conclusion. This is on its face, plain language, very clear. And two of the plaintiffs also accepted a 2020 agreement in addition to the 2015. One of the plaintiffs opted out of that agreement, so would be bound by the 2015 agreement. It's very clear, and the same is true for Judge Chen in the Northern District of California found the same. So there's not a single judge who has found that this language was ambiguous, and it is very clear. And I believe the Osvadics v. Lyft case may have involved a similar provision in Lyft's agreement. So this, we would submit, is very clear, and if plaintiffs believe that it's not, we think it's delegated to the arbitrator. But in any event, whether this court or an arbitrator addresses it, it is clear, and there's no support for what they're arguing. Just one brief point. The argument about contract formation that Plaintiff Singh raised in this appeal, Judge Rendell is exactly right. That was waived because in the first appeal, Mr. Singh's brief admitted that he was taken to the agreement, and he clicked that he agreed, but he just didn't read it. So that would have been an opportunity for him to challenge it then. He did not, so that is waived. If the court has any further questions, I would be happy to answer them. Judge Rendell? I have nothing. Thank you. Okay. Thanks very much. Appreciate it, Ms. Evangelos. Thank you. Oh, I'm sorry. Just as you're escaping, I had meant to ask you about burden of proof. Would you answer Mr. Slender's assertion that the burden of proof lies on Hoover? That's not correct in this Court's decision. In Singh, last time around at page 231, this Court said Plaintiff will bear the burden to establish that Section 1 applies. That's consistent with Greentree, with every other decision, Capriol, Cunningham, and all the others that I've cited that have found that it's Plaintiff's burden. But in any event, it doesn't make a difference because either way, we think the answer is the same. Thank you. Thank you. Just first addressing. Counsel, before you begin, you relied upon Saxon for the proposition that a minimal engagement is sufficient. But that's not what that case is about. That case is about the fact that cargo loaders are part of the interstate transportation of goods. Is that not correct? There was nothing in there about minimal engagement, was there? There was nothing in there suggesting a quantity that was necessary. That's correct. That's the point. It was a manager of Southwest who presumably primarily was supervising the ramp agents, but also frequently two to three times per week loaded cargo on airplanes. So there was no minimum engagement. But the case was about the fact that all of them were involved in the interstate transportation of goods. But they were directly involved in the interstate transportation. That's right. Just like Uber drivers. That's correct. Well, no, not just Uber drivers. Our Uber drivers directly engaged in the interstate transportation of people. Because they directly engaged. Now, if the local people had contracts requiring them to take people to the airport or the railroad or something, that would be akin to the Yellow Cab situation or the Saxon situation. But here we have the vast, vast majority of drivers with absolutely no connection to, you know, the interstate transportation of people. Well, Your Honor, I mean, respectfully, the drivers take passengers directly across state borders. And it's not the vast majority that do not. And just a few points very quickly. One, it was stated that this court previously held it was our burden. That was the concurrence. The concurrence is not the majority opinion. We cite to the majority opinion in our brief where it says the court needs to be convinced. So that was a misstatement. Second, I think my colleague, Mr. Smith, said it's six months for people to get to that percentage. It was actually 50 trips per year, which takes about two weeks. So we were just looking, we were trying to drop off people who, because the vast majority of Uber drivers actually perform less than five trips and then stop working for Uber. You can guess why. So the reality of our situation is we said 50 trips per year. As Uber likes to point out, trips are not very long. So 50 trips per year is not that many. Forty-seven percent of every Uber territory crosses multiple states. So Uber has mapped out the entire U.S. They have dropped it into about 200 or so zones. Forty-seven percent, this is an undisputed fact, go multiple states. And yet they say they are not involved in interstate. Forty-seven percent what? Uber has broken up the United States into 200 or so zones, which drivers can pick up passengers anywhere in that zone. Forty-seven percent of all those zones are multiple states. So it's not the vast majority. It's about half. Well, that doesn't tell you anything about how many trips cross. It doesn't, but it gives you an idea of how central the interstate work is to what they're doing. Because, of course, crossing the state line doesn't necessarily mean that they're not also doing work that's related to crossing the state line. The last thing I want to hit very quickly is the street railroad issue, which no court of appeals has addressed. Every court of appeals, when they determine that railroad workers and seamen were intimately involved in 1925 with interstate trips and long trips, is using a more modern definition of railroad. Now, Uber does argue, and we show why the courts do not agree, street railroads were not in the definition of the 1925 Act, which we would say is incorrect. But, importantly, no court of appeals has said that Uber is right about that. They just continually can think of railroad workers to be like Amtrak is today. You had cited a document to try to indicate that the number of local trips was much larger than the interstate railroad trips. But it looked to me, when I went and looked at the document, that you misread that. You framed it as 900,000, something like that, when the table is stated in thousands, so that the actual number is in the millions and vastly dwarfs the number of street trips. Your Honor, two things. One, I would apologize if I misstated. I don't obviously have that in front of me, but I know the street trips is 15.3 billion, so even at 900,000, it would be 900 million to 15.3 billion. It dwarfs the street trips. Your Honor, we had the graphs that showed the percentages, and if I got 900,000, it was 15.3 billion street. And also, I think, just to understand the historical history of the United States, the automobiles are not yet blown up. The way individuals commuted was through street railroads. They were the vast majority of individuals employed in that industry, as we also cite. So I'm not going to, if the court says that it was 900 million when I said 900,000. No, I don't. I'm not even sure it's 900 million. I've got to, I should have the number right in front of me, but it dramatically alters the assertion that you made. So, but go ahead. Well, Your Honor, the historical reality of the street railroads in the United States is they were the vast majority of railroads operating in 1925. It is how individuals commuted, again, this was before the boom of the automobile. Most individuals were using them for commuting purposes. I mean, that is part of the historical reality of the U.S. And we did say it was 900,000 interstate trips. If you're telling me that it was a thousand to one mistake, that is a significant mistake. I apologize to the court. But we do have 15.3 billion street railroad trips, which is still higher than the thousand X. Apparently, you're saying that I was off. I will apologize if that's correct. 0.3 billion. To 900 million, yeah. So it would still be more. But also, I think we just understand the history of the U.S. It is clear that street railroads played a significant part of local transportation in 1925. No court has addressed this. And Uber's counterpoint is not that that's an incorrect statement. It's that street railroads are excluded from the statute when they say railroad workers. That's not what they mean, street railroad workers. That was Uber's argument, which no court has accepted. No court has dealt with this concern that railroads meant something different in 1925. And as we know from the United States Supreme Court's decisions, we are determined what these words meant at the time they were stated. Thank you, Your Honors. We're well past your minute. I did. Thank you for your time. Thank you, Your Honors. I'd like to make a few points. One, Justice Rendell mentioned the vast majority of drivers do not cross the state line. I think the information that's been developed and discovery is so important because, of course, the vast majority of drivers have a very short tenure with Uber. So one of the unique aspects, I think, that's been developed is that with the high turnover in this class, that in fact many drivers are there for just a week or two, have a handful of trips. They have very little experience. And that goes also to the Wallace test, whether a central part of the job description, quote-unquote, is engaging with interstate commerce. I want you to address Ms. Vangelis' argument, which is no matter how you slice it, this is 2% of trips, period. You're done. You can say some people do it a lot, but if you look at what Uber does, it's 98% of the trips taken on Uber are local trips, period. Is she wrong about her fact? I would say she is. Well, we're not saying that that's wrong. And that's why I think the district court did to disregard the elements of the turnover impact of the 50-plus drives and seeing what the longer tenure drivers does. So it's not to be disregarded that the 2% of all trips are a factor. The question is whether the 2% of all trips is the be-all and end-all for determining what is central to the work done by the Uber drivers. And that becomes a different concept here when we're talking about ride share, where the work is very different for those workers who do most of the work and a different experience for those drivers that do very little work. So if we go into a workplace and we're asking for the experience of the workers, if we see a room of workers and they've all been there for a week and we ask them what the job is, they're going to have a very different description, likely to have a different description, of the workers who have been there for a year or two years. And if we want to get to the central job description, I would submit, we would submit that we would speak to those workers that have the greatest experience. So that's that key point, and that's what's a unique aspect of this industry that's not reflected in the history of analyses in these areas. I think also with regard to Wallace, Wallace is a central, I think, analytical tool, but Wallace also cites to Keenstra favorably. It is not inconsistent. Yet Cunningham cites to Keenstra and says that's inconsistent with Capriol and ultimately the decision in Cunningham. I think those two are reconciled by finding that the 2% is not a de minimis standard that says you're out because Keenstra says basically at 2% you're in. So how do those two work is because the engagement is sufficient. And here being across the board in this industry is what makes it sufficient. Also, Your Honor, with regard to the state law issue, the evidence that's been submitted by Uber with regard to where the driver selected to the state is not dispositive of the state of residence at all. So there's no evidence in the record of the state of residence of the drivers such that the arbitration could even be enforced under state laws of the many opt-ins who are outside of the state of New Jersey, which are totally unaddressed by the district court. I understand your point. Thank you. We thank counsel for their arguments. We've got the matter under advisement, and we'll go ahead and call our next case.